# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:15-CR-7-TLS |
| | ) | |
| JARED E. HOCHSTEDLER | ) | |

**SENTENCING OPINION**

On February 26, 2015, the Defendant, pursuant to a written Plea Agreement [ECF No. 4], pled guilty to all three counts of an Information [ECF No. 1] charging him with filing false income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 1 and 2), and perjury, in violation of 18 U.S.C. § 1621(1) (Count 3). In preparation for sentencing, the United States Probation Office prepared a Presentence Investigation Report (PSR) [ECF No. 22] on April 30, 2015, which was last revised on December 1, 2015 [ECF No. 35]. The PSR calculates the applicable guideline range for the Defendant's offenses as 27 to 33 months of imprisonment.[1] On April 23, 2015, the Defendant filed a Sentencing Memorandum [ECF No. 20] and letters to the Court from himself and his friends/family members. Through these submissions, the Defendant requested a sentence of probation. On May 7, 2015, the Government filed a Response [ECF No. 26], wherein it requested a term of imprisonment at the low-end of the applicable guideline range.

On December 2, 2015, the Court held a sentencing hearing, at which the Court received additional arguments from both parties as to the appropriate sentence for the Defendant. The

---

[1] The Court notes that, prior to November 1, 2015, the Defendant's applicable guideline range was 33 to 41 months of imprisonment. However, Amendment 791 to the United States Sentencing Guidelines—which took effect on November 1, 2015—results in a guideline calculation of 27 to 33 months of imprisonment.

Court concluded that a sentence of 27 months of imprisonment, followed by a term of supervised release of one year, is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. The Court provides its reasoning below.

**BACKGROUND**

The Defendant—a 40-year-old resident of Fort Wayne, Indiana—is the founder and former chief executive officer of Enzyme Environmental Solutions ("EESO"), and the former owner and operator of the investment entity Providence IB. The Defendant's relevant offense conduct—which spans a four-year period from 2008 to 2011—principally arises from a series of equity-for-stock swap agreements, also known as "wrap-around agreements," that the Defendant facilitated and/or participated in between 2008 and 2009. In relation to these agreements and other financial activity, the Defendant went on to provide false testimony to the Securities and Exchange Commission (SEC) and make false statements to the Internal Revenue Service (IRS).

**A.      Wrap-Around Agreements Between K&L, Signature, and Bebida**

In 2008, the Defendant converted EESO into a publicly-traded company by acquiring another publicly-traded company whose stock was traded on the over-the-counter pink sheet market (i.e., penny stocks). As a means of raising capital, the Defendant performed five wrap-around agreements between himself, K&L International Enterprise, Inc. ("K&L"), and Signature Worldwide Advisors, LLC ("Signature"). Pursuant to these agreements, EESO claimed it owed the Defendant accrued wages and "other debt" from prior years. Signature and K&L then assumed this debt at a discount, and in exchange, received promissory notes from EESO that

2

were convertible into EESO's common stock. In conjunction with the wrap-around agreements, K&L provided business loans to EESO in the amount of $1,066,44, also in exchange for convertible promissory notes.

As a result of the five wrap-around agreements, K&L and Signature assumed $3,271,520 in accrued wages and other debt, and paid the Defendant over $2.8 million during the 2008 and 2009 tax years. According to the Defendant, "[a] good portion of the money that was raised went to [his] personal bank account and [was] used . . . to support a lavish lifestyle." (Def.'s Letter, ECF No. 20-1 at 2.) In turn, K&L and Signature made large profits by converting the promissory notes into common stock and selling such stock on the over-the-counter market.

In early 2009, the Defendant also facilitated a sixth wrap-around agreement by contacting a business associate, B.W., who had established a drink company. After assisting B.W. in acquiring a publicly-traded company (Bebida Beverage Company) from the owner of Signature, the Defendant executed a wrap-around agreement whereby, this time, the Defendant assumed the debt of Bebida at a discount in exchange for a promissory note convertible into Bebida's common stock. Consequently, the Defendant acquired hundreds of millions of shares of Bebida, and eventually sold such shares in 2009 for $1,002,997.

**B.     SEC Investigation**

In 2009, the SEC began investigating the activities of EESO, K&L, and Signature. After obtaining a cease and desist order to prevent any further trading of EESO shares, the SEC deposed the Defendant on June 23, 2009. When asked about the 2009 sale of Bebida shares, the Defendant, while under oath, failed to disclose the wrap-around agreement between himself and

3

Bebida; and instead, committed perjury by stating that B.W. provided the Defendant with Bebida shares as repayment for loans made by the Defendant over the previous five or six years.[2]

## C.    Fraudulent Tax Returns

In 2010, following the SEC investigation, the Defendant filed his 2008 and 2009 federal individual income tax returns. Although a substantial portion of the income received from the wrap-around agreements constituted taxable income, the Defendant failed to report it. For example, in the 2009 return, the Defendant claimed $0 in taxable income, paid $0 in income taxes, claimed the Earned Income Tax Credit, and received $6,300 as a refund from the federal government. Additionally, the Defendant provided his tax preparer with a fraudulent document

---

[2]The Defendant testified as follows:

SEC: Why did Bebida issue that (stock) certificate to you?
[Defendant:] I converted some debt into—they owed me money. And so they couldn't pay it so I asked them to issue stock.
SEC: What debt did they owe you, what did the debt stem from?
[Defendant]: I have been loaning the gentleman who owns Bebida money for the past five, six years, as he needed it for some other companies and for growing—he had an energy drink company called Potencia. And he needed funds to get started, two to three years ago.

* * *

SEC: And you also mentioned that Bebida issued you shares to pay off the debt?
[Defendant:] Correct.
SEC: How many shares did they issue you?
[Defendant:] I think a total of 1.3 billion, 1.4 billion shares.
SEC: Have you been able to sell those shares?
[Defendant:] Some of them I have. I still hold some of them.
SEC: How much have you been able to sell?
[Defendant:] Without looking back, about a billion shares.
SEC: How much did you receive for the billion shares?
[Defendant:] In the range of $300,000 to $400,000, I believe.

(PSR ¶¶ 33–47.)

showing that he paid $796,000 for the Bebida stock, when in actuality, the Defendant made "little investment" for the stock. (PSR ¶ 29.) Because this figure was reported as the tax basis for the Bebida stock, the Defendant under reported his capital gain on the sale as $206,997 ($1,002,997 (amount sold) minus $796,000 (amount paid)). The Defendant also failed to report the $1,066.44 in loans from K&L (which were written off after the Defendant informed K&L that neither he nor EESO could repay the loans) and failed to file a 2010 tax return.

D.  **Providence IB**

In addition to his participation in the wrap-around agreements with K&L, Signature, and Bebida, the Defendant also operated Providence IB from 2008 to 2009. During this time, the Defendant and other associates recruited investors through assurances that the Defendant would invest their money on the foreign currency exchange. Although the Defendant collected over $1 million from investors, less than ten percent of the principal was invested in the foreign currency exchange. The principal was instead spent by Providence IB for advances to EESO, pay roll expenses, dividends, office supplies, interest payments, consulting fees, and other expenditures.

In 2009, the Securities Division of the Indiana Secretary of State shut down Providence IB, and ordered the Defendant to return investor proceeds. After the Defendant returned his investors' proceeds, he received $350,000 from an associate of Providence IB. The Defendant did not report the $350,000 on his 2009 tax return, or any other subsequent tax return.

**ANALYSIS**

When sentencing a defendant, the district court "must first calculate the Guidelines range,

and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see United States v. Panice*, 598 F.3d 426, 441 (7th Cir. 2010) (citing *Nelson*, and setting forth the two-step process that a sentencing court must engage in to determine a defendant's sentence). When calculating the guideline range, "[a] district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008). "The defendant bears the burden of proving that the PSR is inaccurate or unreliable," and if he offers no evidence to question the PSR's accuracy, the Court may rely on it. *Id*.

Here, the PSR includes a base offense level of 20 under U.S.S.G. § 2T1.1(a)(1) for Counts 1 and 2 because the tax loss resulting from the Defendant's offenses was greater than $550,000, but not greater than $1,500,000; and a base offense level of 14 under U.S.S.G. § 2J1.3(a) for Count 3. This results in an adjusted offense level of 21. The adjusted offense level is then lowered by 3 levels for acceptance of responsibility and for assisting authorities in the investigation or prosecution of the Defendant's own misconduct, § 3E1.1(a–b), resulting in a total offense level of 18. Combining this offense level with the Defendant's criminal history category of I results in a guideline range of 27 to 33 months of imprisonment.

**A.     § 3553(a) Factors**

In imposing a sentence, § 3553(a) requires a court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, and impose a sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

6

adequately capturing the seriousness of the offense, providing just punishment, promoting respect for the law, affording adequate deterrence, protecting the public, and rehabilitating the defendant. In making this determination, a district court may not presume that the Guidelines sentence is the correct one. *Nelson*, 555 U.S. at 352; *Rita v. United States*, 551 U.S. 338, 351 (2007). Ultimately, a district court must make an independent determination, taking into account the types of sentences available, the other relevant § 3553(a) factors, and the arguments of the parties. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). "[A] district court can vary categorically from every guideline, including the career offender guidelines." *United States v. Redmond*, 667 F.3d 863, 876 (7th Cir. 2012) (citing *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010)).

First, as to the nature and circumstances of the offenses, the record demonstrates that over a four-year time period, the Defendant engaged in a pattern of serious and wide-ranging criminal financial activity. Between 2008 and 2009, the Defendant used his considerable business acumen to not only participate in, but facilitate multiple illegal transactions (i.e., wrap-around agreements) with multiple entities. Such transactions involved the creation of suspect debt, the manipulation of the over-the-counter market, and ultimately, the reaping of millions of dollars of income by the Defendant and his business associates. Despite the initiation of an SEC investigation into the Defendant's business practices, the Defendant actively concealed the wrap-around agreements (and the substantial income derived therefrom) by lying to federal investigators in 2009, filing false tax returns in 2010, and failing to file a tax return in 2011.

Notably, the Defendant's misdeeds in relation to the wrap-around agreements were not in isolation. As detailed above, the Defendant generated substantial capital (over $1 million) as the

owner and operator of Providence IB by lying to his investors. This eventually led to the Indiana Secretary of State's action to shut down Providence IB and order the Defendant to return investor proceeds. Here again, the Defendant—similar to his concealment the millions of dollars received from the wrap-around agreements in 2008 and 2009—concealed the $350,000 he received from a Providence IB associate by failing to report it on his 2009 tax return. During this same tax year, the Defendant claimed $0 in taxable income, paid $0 in income taxes, claimed the Earned Income Tax Credit, and received $6,300 as a refund from the federal government.

To support his request for a term of probation, the Defendant emphasizes his family contributions and charitable work, as documented by the letters and statements from the Defendant and his friends/family members. Generally, the United States Sentencing Guidelines discourage courts from factoring "family ties and responsibilities" and "[c]ivic, charitable, or public service; employment-related contributions; and similar prior good works" when deciding whether to depart from the applicable guideline range. U.S.S.G. §§ 5H1.6, 1.11; *see also United States v. Camacho-Montalvo*, 583 Fed. App'x. 552, 553 (7th Cir. 2011) ("District courts need not discuss routine family-ties arguments that do not encompass extraordinary circumstances."); *United States v. Wilke*, 156 F.3d 749, 754 (7th Cir. 1998) ("[D]istrict courts may consider [charitable good works] in extraordinary cases."). Here, the Defendant has not presented any extraordinary circumstances to warrant a mitigated sentence under Guidelines sections 5H1.6 or 5H1.11. *See, e.g.*, *United States v. Pereira*, 272 F.3d 76, 80–81 (1st Cir. 2001) (noting that "time-consuming family responsibilities" are not sufficiently extraordinary to warrant a downward departure); *Camacho-Montalvo*, 583 Fed. App'x. at 554 ("Courts often do not

8

consider the defendant's continuous care for family members to be extraordinary.").[3]

Additionally, the Defendant has not presented any mitigating explanation for his relevant offense conduct (i.e., family, financial, or personal crisis). Instead, the Defendant admits that his financial criminal activity was motivated by—in the Defendant's own words—the "values of greed" and the desire to live a "lavish lifestyle." (Def.'s Letter, ECF No. 20-1 at 2, 4.)

The Defendant also argues that a term of incarceration is inappropriate because it would inhibit his ability to pay the IRS his restitution obligation of $1,232,739. But as the Court noted at the sentencing hearing, this issue is of far less consequence to the Court than the need to impose a sentence that not only deters future criminal conduct of the Defendant, but others who may contemplate similar crimes.

In sum, after a careful review of the PSR and consideration of all of the evidence and the parties' arguments, and considering the nature and circumstances of the offenses and the history and characteristics of the Defendant, as well as the purposes of punishment—including the need to provide just punishment for the offense, to impose a sentence that reflects the seriousness of the offense and that promotes respect for the law, to adequately deter future criminal conduct, to protect the public from future crimes of the Defendant, and to avoid unwarranted disparity in sentencing—the Court determines that a low-end guideline sentence of 27 months of imprisonment, followed by a term of supervised release of one year, is sufficient, but not greater than necessary, to comply with the purposes of punishment.

---

[3] The Court also notes that, in its brief, the Government highlights the Defendant's statements in relation to his charitable work—namely, that his "life changed forever" after visiting Haiti in early 2010 and that he realized "[he] need[ed] to make significant changes in [his] life" (Def.'s Letter, ECF No. 20-1 at 3)—and how such statements are contradicted by the Defendant's own behavior. For example, subsequent to the Defendant's trip to Haiti, he filed his falsified tax returns for 2008 and 2009, and failed to file a tax return for 2010.

**CONCLUSION**

For the reasons stated above, the Court SENTENCES the Defendant to a term of imprisonment of 27 months, followed by a term of supervised release of one year.

SO ORDERED on December 3, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT